KEVIN S. ROSEN (Bar No. 133304)
krosen@gibsondunn.com
JASON C. LO (Bar No. 219030)
jlo@gibsondunn.com
GIBSON DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, California 90071-3197
Tel: 213-229-7635
Fax: 213-229-6635

Attorneys for Counsel to Netlist, Inc.
DLA PIPER LLP (US)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

NETLIST, INC., a Delaware Corporation,

Plaintiff,

v.

INPHI CORPORATION, a Delaware Corporation,

Defendant.

CASE NO. CV 09-06900-DSF-RNB

**OPPOSITION TO INPHI CORPORATION'S MOTION TO DISQUALIFY DLA PIPER LLP (US) DUE TO ALLEGED CONFLICT OF INTEREST**

[Declarations of Brian Forbes, Sean Cunningham, David Colker, and Tamara Shepard filed concurrently herewith]

Hon. Dale S. Fischer

Complaint Filed: September 22, 2009

Hearing
Date: January 10, 2011
Time: 1:30 p.m.
Place: Courtroom 840

# TABLE OF CONTENTS


Page

I. OVERVIEW AND SUMMARY OF ARGUMENT .......... 2

II. STATEMENT OF FACTS .......... 4

III. DLA PIPER SHOULD NOT BE DISQUALIFIED FROM REPRESENTING NETLIST .......... 7

A. Courts Disfavor Disqualification Motions And Grant Them Only In Rare And Extraordinary Circumstances .......... 7

B. The Netlist And Inphi Representations Are Not Substantially Related, And Thus The Alleged Conflict May Be Waived With Informed Written Consent .......... 8

1. Adverse Clients May Consent To Simultaneous Representation .......... 8

2. The Tax Representation And The Patent Representation Are Not Substantially Related, And Inphi Has Not Met Its Burden Of Establishing Otherwise .......... 13

C. Inphi Provided Informed Written Consent Waiving Any Alleged Conflict Arising Out Of The Netlist Representation .......... 16

1. The Waiver Provision In The Engagement Letter Permits DLA Piper To Represent A Party Adverse To Inphi In An Ongoing Litigation .......... 16

2. The Tishman And Comerica Letters Do Not Undermine The Express Meaning Of The Engagement Letter .......... 20

IV. CONCLUSION .......... 21

TABLE OF AUTHORITIES

**Cases**

*Chambers v. Sup. Ct.*,
121 Cal. App. 3d 893 (1981) .......... 8

*Cinema 5, Ltd. v. Cinerama, Inc.*,
528 F.2d 1384 (2d Cir. 1976) .......... 11

*City and County of San Francisco v. Cobra Solutions, Inc.*,
38 Cal. 4th 839 (2006) .......... 12, 15

*Concat LP v. Unilever, PLC*,
350 F. Supp. 2d 796 (N.D. Cal. 2004) .......... 3, 8

*Elliott v. McFarland Unified School Dist.*,
165 Cal. App. 3d 562 (1985) .......... 15

*Faughn v. Perez*,
145 Cal. App. 4th 592 (2006) .......... 14

*Flatt v. Superior Court*,
9 Cal. 4th 275 (1994) .......... 10

*Gregori v. Bank of America*,
207 Cal. App. 3d 291 (1989) .......... 7, 8

*H.F. Ahmanson Co. v. Salomon Brothers Inc.*,
229 Cal. App. 3d 1445 (1991) .......... 14, 15

*Hitachi, Ltd. v. Tatung Co.*,
419 F. Supp. 2d 1158 (N.D. Cal. 2006) .......... 11

*In re Cellcyte Genetic Corp. Securities Litigation*,
2008 WL 5000156 (W.D. Wash. 2008) .......... 9, 10

*In re Charlisse*,
45 Cal. 4th 145 (2008) .......... 14

*In re County of Los Angeles*,
223 F.3d 990 (9th Cir. 2000) .......... 12

*Ishmael v. Millington*,
241 Cal. App. 2d 520 (1966) .......... 9

*Laker Airways v. Pan American World Airways*,
103 F.R.D. 22 (D.D.C. 1984) .......... 14

*Navarro v. Mukasey*,
518 F.3d 729 (9th Cir. 2008) .......... 19

*Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*,
760 F.2d 1045 (9th Cir. 1985) .......... 7

*People v. SpeeDee Oil Change Systems, Inc.*,
20 Cal. 4th 1135 (1999) .......... 7

*Roush v. Seagate Tech., LLC*,
150 Cal. App. 4th 210 (2007) .......... 8

*Santa Clara County Counsel Attys. Assn. v. Woodside*,
7 Cal. 4th 525 (1994) .......... 9

*Santa Teresa v. City of San Jose*,
114 Cal. App. 4th 689 (2003) .......... 14, 15

*Truck Ins. Exchange v. Fireman's Fund Ins. Co.*,
6 Cal. App. 4th 1050 (1992) .......... 14, 16

*Visa USA, Inc. v. First Data Corp.*,
241 F. Supp. 2d 1100 (N.D. Cal. 2003) .......... passim

*Zador Corp. v. Kwan*,
31 Cal. App. 4th 1285 (1995) .......... 9

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) .......... 15

## Other Authorities

*Black's Law Dictionary* (9th ed. 2009) .......... 18

*Merriam Webster's Collegiate Dictionary* (11th ed. 2005) .......... 18

*Webster's New Universal Unabridged Dictionary* (Deluxe 2d ed. 1983) .......... 18

## Treatises and Journals

David L. Schwartz, *Court Specialization: An Empirical Study of Claim Construction Comparing Patent Litigation Before Federal District Courts and the International Trade Commission*,
50 Wm. & Mary L. Rev. 1699, 1702 (2009) .......... 17

Robert W. Hahn and Hal J. Singer, *Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*,
21 Harvard J. of L. & Tech. 457 (2008) .......... 18

Wolfram, *Modern Legal Ethics*,
§ 7.2.2, p. 339.) .......... 9

## I. OVERVIEW AND SUMMARY OF ARGUMENT

In order to obtain limited international tax advice from DLA Piper LLP (US) ("DLA Piper"), Inphi signed an Engagement Letter that contains an express and valid conflict waiver. This Court should give effect to that waiver and deny Inphi's Motion.

By Inphi's own account, the waiver provision is both valid and broad – a waiver that "articulates a wide range of different types of representation" in which DLA Piper clients may take positions adverse to Inphi. (Mot. at 7.) In addition, the waiver includes various *examples* of adverse representations in both the transactional and non-transactional context. Transactional examples include mergers, change-in-control disputes, license negotiations, and general corporate matters. Non-transactional examples include legislative or policy matters, as well as administrative proceedings such as those arising in connection with patent disputes.

Despite conceding the validity and breadth of the waiver provision, Inphi nevertheless urges the Court to ignore the plain meaning of the waiver provision and disqualify DLA Piper as counsel to Netlist. Inphi's strategic argument, calculated to divest Netlist of its chosen counsel, is based entirely on misreading a narrow limitation contained in the waiver provision – namely, DLA Piper's agreement that it would not "*institute* litigation against Inphi." But here, there is no dispute that DLA Piper played no part in instituting this litigation, or the co-pending patent litigation between Inphi and Netlist. Instead, DLA Piper was retained nearly one year *after* both litigations had begun.

Unable to dispute the plain meaning of the word "institute," Inphi chooses instead to ignore it altogether. It thus argues that the Court should give effect *not* to the parties' written agreement, but to subjective, amorphous, and unsupported concepts such as "how Inphi understood the exclusion." There is, of course, no precedent for this strategic and *post hoc* re-write of the Engagement Letter. Indeed, Inphi's position is particularly improper given the potential draconian consequences here. As the courts repeatedly have stated, disqualification of a party's counsel is a drastic measure

that "is generally disfavored and should only be imposed when absolutely necessary." *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 814 (N.D. Cal. 2004).

Inphi's other arguments are as unfounded as its interpretation of the waiver provision. For example, Inphi cites various cases to suggest DLA Piper's representation of adverse clients would violate its duties of loyalty and of confidentiality. But those cases – as well as the California Rules of Professional Conduct – *do not* preclude representation of adverse clients. They only forbid representation of adverse clients *without prior written consent*. Here, Inphi provided that prior written consent in the Engagement Letter.

Moreover, DLA Piper's representation of Netlist poses no actual or potential threat to its duty of confidentiality. That is because, prior to undertaking its representation of Netlist, DLA Piper imposed an ethical wall that prevents those lawyers working for Netlist from discussing anything related to that representation or having access to any files related to that representation with lawyers representing Inphi in completely unrelated international tax matters, and vice versa. Inphi has not come forward with any evidence that this ethical wall has been – or may be – breached. The only evidence, submitted with this Opposition, is that the ethical wall has been scrupulously maintained by DLA Piper.

Finally, while Courts will presume a breach of the duty of confidentiality where the moving party meets its burden of establishing that the two representations are "substantially related," Inphi has not alleged – much less come forward with admissible evidence – that the international tax advice DLA Piper provided to Inphi is substantially related to the patent litigation advice DLA Piper intends to provide to Netlist here.

Because Inphi knowingly waived DLA Piper's representation of future adverse parties, and because DLA Piper played no role in instituting this litigation, DLA Piper should be permitted to represent Netlist. Inphi's Motion therefore should be denied.

## II. STATEMENT OF FACTS

Inphi seeks to disqualify DLA Piper as counsel to Netlist in two litigation proceedings, both of which began without DLA Piper's knowledge or involvement. Netlist initiated this proceeding on September 22, 2009, asserting a single count for patent infringement (the "Netlist Litigation"). At the time, Netlist was jointly represented by the Pruetz Law Group LLP and Lee Tran & Liang APLC. Inphi was represented by its current law firm, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). Two months later, on November 30, 2009, Inphi instituted a separate patent infringement action against Netlist (the "Inphi Litigation").[1] Pillsbury again represented Inphi. And the same lawyers who represented Netlist in the Netlist Litigation represented it when Netlist served its Answer on January 15, 2010: the Pruetz Law Group LLP and Lee Tran & Liang APLC.

DLA Piper's first involvement with either of the parties in this case did not occur until nearly *two months after* both the Netlist Litigation and the Inphi Litigation already had been filed, and in a context wholly unrelated to either litigation. In January 2010, Inphi representatives approached David Colker of DLA Piper's East Palo Alto office to represent it in connection with certain unrelated international tax matters (the "Tax Representation"). (Colker Decl. ¶ 4.)

Before agreeing to represent Inphi, DLA Piper secured a waiver of both pre-existing and future potential conflicts. With respect to pre-existing conflicts, a routine conflicts check revealed that DLA Piper's representation of Inphi might create a potential conflict with two of the firm's pre-existing clients: Comerica Bank and Tishman Speyer Properties. (Colker Decl. ¶ 5.) DLA Piper discussed the potential conflict with Inphi and secured an oral agreement that Inphi would provide a written waiver agreement. (Colker Decl. ¶ 6.)

---

[1] *Inphi Corp. v. Netlist, Inc.*, Case No. CV 09-8749-AHM (CWx).

In an email to Inphi's Chief Financial Officer, John Edmunds, Mr. Colker explicitly confirmed that additional conflict waiver letters relating to Comerica and Tishman would be forthcoming: "After we talked I learned that the bank and landlord conflict waiver letters will be in a separate letter which I should receive soon. However, we do have oral waivers so there should be no issue." (Colker Decl., Exh. 2.) Those letters were provided to Inphi shortly thereafter, and subsequently were signed by Mr. Edmunds on behalf of Inphi. (Colker Decl., Exhs. 3-4.)

DLA Piper also obtained a waiver of any future potential conflicts through its engagement letter dated February 2, 2010 ("Engagement Letter"). (Forbes Decl., Exh. 2.) The Engagement Letter's subject line was "Engagement and Conflict Waiver Letter for International Tax Matters," and it contains an express conflict waiver provision:

> DLA Piper LLP (US) is a large law firm with offices in various locations throughout the United States, and with related practice entities located in Europe, Asia, Africa and Australia. We may currently or in the future represent one or more other clients in unrelated matters or transactions in which your interests or those of Your Affiliates are adverse to those other clients. For example, we may represent other clients in corporate matters involving or concerning Inphi or your affiliates (including mergers and acquisitions, takeovers, and other change-in-control issues and transactions), or in commercial transactions with Inphi or your affiliates (including preparation and negotiation of agreements, licenses, leases, loans, securities offerings or underwritings), or in other matters and transactions involving Inphi or your affiliates. We may also represent other clients on legislative or policy matters, or in administrative proceedings that may involve or affect Inphi or your affiliates. This will confirm that Inphi waives all such conflicts of interest, and consents to the Firm's current and future representation of such other clients in any of such matters without the need for any further notice or consent from Inphi or its affiliates even though your interests are adverse, provided that such matters are not the same, or substantially related to, a matter in which we represent Inphi. We do not view this advance waiver and consent regarding unrelated matters to permit us to institute litigation against Inphi nor to permit unauthorized disclosure or use of any of Inphi's confidential or privileged documents or information which Inphi has provided to us as Inphi's lawyers.

As will be described and discussed in detail below, this provision effects a waiver of future conflicts, including the matter that is the subject of the pending Motion.

The Engagement Letter contains other important provisions. Chief among them, DLA Piper and Inphi acknowledged that unless they "expressly agree[d] otherwise," the scope of the engagement of DLA Piper by Inphi is limited to providing representation "in connection with [Inphi's] international tax matters and related corporate implementation."

After February 2010, and in reliance on Inphi's waiver, DLA Piper provided certain legal advice to Inphi relating to international tax matters. The DLA Piper attorneys who participated in providing such advice are all members of DLA Piper's Tax practice; and none of them has ever provided patent litigation advice to any client, including Inphi. (Colker Decl. ¶ 13; Shepard Decl. ¶ 5.) Indeed, the DLA Piper attorneys with primary responsibility for the Inphi Tax Representation, Tamara Shepard and David Colker, were completely unaware of the ongoing patent disputes between Inphi and Netlist until recently. (Colker Decl. ¶ 14; Shepard Decl. ¶ 6.)

In October 2010, nearly one year into the Inphi Litigation and the Netlist Litigation, Netlist sought to retain Sean Cunningham, in DLA Piper's San Diego office, as litigation counsel in the ongoing patent disputes between Inphi and Netlist (the "Patent Representations"). (Cunningham Decl. ¶ 4.) A conflicts check revealed the firm's representation of Inphi. (Cunningham Decl. ¶ 5.) DLA Piper sought – and received – an appropriate conflict waiver from Netlist on October 22, 2010. (Cunningham Decl. ¶ 5.) Because Inphi already had waived any future conflicts, including with respect to the Patent Representations, and in reliance on that waiver, DLA Piper did not again seek a conflict waiver from Inphi. (Forbes Decl. ¶ 12.)

DLA Piper immediately erected an ethical wall between those members of the firm working on behalf of Netlist, and those working on behalf of Inphi. (Forbes Decl. ¶¶ 15-18 & Exh. 7.) All DLA Piper attorneys have steadfastly obeyed this ethical wall; no member of the DLA Piper team representing Netlist has ever had communications with any member of the DLA Piper team representing Inphi regarding the substance of his or her respective representation. (Forbes Decl. ¶ 18 & Exh. 7; Colker Decl. ¶¶ 14-

15; Shepard Decl. ¶¶ 6-7; Cunningham Decl. ¶¶ 6-7.) Moreover, the DLA Piper attorneys representing Netlist are all resident in the firm's San Diego or Austin office. (Cunningham Decl. ¶ 8.) None of the DLA Piper attorneys representing Inphi are resident in either the firm's San Diego or Austin office. (Colker Decl. ¶ 12.)

## III. DLA PIPER SHOULD NOT BE DISQUALIFIED FROM REPRESENTING NETLIST

### A. Courts Disfavor Disqualification Motions And Grant Them Only In Rare And Extraordinary Circumstances

"[A]s courts are increasingly aware, motions to disqualify counsel often pose the very threat to the integrity of the judicial process that they purport to prevent." *Gregori v. Bank of America*, 207 Cal. App. 3d 291, 300-01 (1989). "Such motions can be used to harass opposing counsel, to delay the litigation, or to intimidate an adversary into accepting settlement terms on terms that would otherwise not be acceptable." *Id.* (citations omitted).

"Because of this potential for abuse, disqualification motions should be subjected 'to particularly strict judicial scrutiny.'" *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985) (citation omitted). As the California Supreme Court explained:

> A motion to disqualify a party's counsel may implicate several important interests. Consequently, judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice. [Citation.] Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion.

*People v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135, 1144-45 (1999). "A client deprived of the attorney of his choice suffers a particularly heavy penalty where, as appears to be the case here, his attorney is highly skilled in the relevant area of the law." *Gregori*, 207 Cal. App. 3d at 300.

Because the ability to be represented by one's counsel of choice is a "significant right," courts "should be quite hesitant to disqualify an attorney." *Chambers v. Sup. Ct.*, 121 Cal. App. 3d 893, 902 (1981). In addition, "[i]t must be remembered . . . that disqualification is a drastic course of action that should not be taken simply out of hypersensitivity to ethical nuances or the appearance of impropriety." *Roush v. Seagate Tech., LLC*, 150 Cal. App. 4th 210, 219 (2007). "Because disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary." *Concat LP*, 350 F. Supp. 2d at 814.

In its Motion, Inphi argues that DLA Piper should be disqualified for two reasons, both of which are unfounded. *First*, the alleged conflict implicated by DLA Piper's representation of Inphi and Netlist necessarily requires a violation of the duties of loyalty and confidence, and thus cannot be waived under any circumstances. *Second*, even if the conflict is one that could be waived, Inphi did not provide such a waiver.

Neither argument by Inphi has merit, and both fall far short of the high hurdle required for this Court to strip Netlist of its counsel of choice. Accordingly, Inphi's Motion should be denied.

**B. The Netlist And Inphi Representations Are Not Substantially Related, And Thus The Alleged Conflict May Be Waived With Informed Written Consent**

**1. Adverse Clients May Consent To Simultaneous Representation**

In its Motion, Inphi repeatedly suggests – but never explicitly argues – that the alleged conflict is one that can never be waived. Inphi does not explicitly state that the alleged conflict is not waivable because any such argument would be plainly inconsistent with the law. Courts repeatedly have held that "a law firm may . . . simultaneously represent two adverse clients if full disclosure of the situation is made to both clients and both agree in writing to waive the conflict." *Visa USA, Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1105 (N.D. Cal. 2003) (citation omitted). *See also Ishmael v. Millington*, 241 Cal. App. 2d 520, 528 (1966) (same).

These decisions are rooted in California Rule of Professional Conduct 3-310(C), which provides, in relevant part, that "[a] member shall not, *without the informed written consent* of each client . . . (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." (emphasis added). Thus, the Rules of Professional Conduct provide an explicit avenue by which any concerns about the duty of loyalty can be waived by the clients, and appropriately managed by the attorneys. *See Santa Clara County Counsel Attys. Assn. v. Woodside*, 7 Cal. 4th 525, 548 n.6 (1994) ("The Court of Appeal below relied for its holding in large part on rule 3-310(C). Case law has interpreted this rule, and its predecessors, to prohibit attorneys, *without consent*, from representing not only clients with conflicting interests in particular matters of representation, but also to prohibit attorneys from accepting employment adverse to a client even though the employment is unrelated to the representation of the current client.") (emphasis added).

As the courts have explained, "[g]iving effect to a client's consent to a conflicting representation might rest either on the ground of contract freedom or on the related ground of personal autonomy of a client to choose whatever champion the client feels is best suited to vindicate the client's legal entitlements." *Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285, 1295 (1995) (*citing* Wolfram, *Modern Legal Ethics*, § 7.2.2, p. 339.).

The cases cited by Inphi do not suggest a different result. Preliminarily, the decision in *In re Cellcyte Genetic Corp. Securities Litigation*, 2008 WL 5000156 (W.D. Wash. 2008), is inapposite because it is rooted in Washington professional responsibility standards. (Mot. at 10.) The Washington Rules of Professional Conduct diverge from the California Rules of Professional Conduct in at least one significant manner: Washington strictly prohibits the representation of adverse clients in litigation. *Id.* at *2 (noting that the Washington rules prohibit dual representation where the representation would "involve the assertion of a claim by one client against

another client represented by the lawyer in the same litigation or other proceeding before a tribunal"). By contrast, under California law, such litigation representation *is* permitted. *See Visa USA*, 241 F. Supp. 2d 1100 (where waiver had been obtained, holding that law firm can represent VISA in pending litigation against First Data Corporation, even though law firm represents First Data in another litigation).

Inphi's reliance on *Flatt v. Superior Court*, 9 Cal. 4th 275 (1994), is equally inapposite. In *Flatt*, the attorney did not represent two adverse clients. Instead, the attorney chose *not* to undertake the second representation upon discovering the apparent conflict, and the question was "the scope of an attorney's duty to give advice when severing a relationship with a new or prospective client after learning that the representation" might trigger a conflict. *Id.* at 278. And as subsequent decisions confirm, any dicta in *Flatt* relating to the representation of adverse parties was limited to circumstances in which the clients did not execute conflict waivers:

> But, as Visa and Heller note, the presumption may be rebutted and a law firm may nonetheless simultaneously represent two adverse clients if full disclosure of the situation is made to both clients and both agree in writing to waive the conflict. Here, it is undisputed that Heller and First Data executed a conflict waiver letter. Neither *Flatt* nor *Mindscape* involved situations where a conflict waiver letter had been executed, and thus they do not control.

*Visa USA*, 241 F. Supp. 2d at 1105 (citations omitted).

Like the *Flatt* case, the remaining cases cited by Inphi merely suggest that a law firm may not, *without prior consent*, represent two clients with adverse interests; they do *not* preclude such representation where, as here, a proper waiver has been obtained. (Mot. at 9-10.) For example, Inphi prefaces its citation to the *Image Technical Service* case with the concession that it involves "[s]imultaneous representation of clients with conflicting interest, and *without written informed consent*." (Mot. at 5 (emphasis added).)

Similarly, the *Hitachi* case did not present a situation in which one or both clients provided a written waiver. *See Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d

1158 (N.D. Cal. 2006). The *Hitachi* case is also distinguishable for another reason: there, the Court disqualified the attorneys because it found the two representations to be substantially related: "[T]he Court finds that disqualification is warranted, in part because this action and the action in which Mr. Hong represented Hitachi are so substantially related—indeed, they are nearly identical." *Id.* at 1164. Here, Inphi properly does *not* contend that its international tax matters are substantially related to the patent litigation in this case.

Inphi's citation to *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976), is equally misplaced. Inphi cites *Cinema 5* for the proposition "the conflict cannot be waived." (Mot. at 10.) But in *Cinema 5*, the attorneys had failed to obtain written consent. Although the Second Circuit affirmed the underlying disqualification order, it suggested that disqualification would not have been required had such consent been obtained. *Id.* at 1386 (noting litigation adversity not permitted without "knowledge and consent of all concerned").

Throughout its Motion, Inphi also argues that the alleged conflict is irreconcilable because DLA Piper will have "on-going access to Inphi's confidential information." (Mot. at 5.) In so doing, Inphi urges the Court to find that DLA Piper's representation of Inphi and Netlist will necessarily result in a breach of the duty of confidentiality to one or both clients.

But just as the duty of loyalty can be managed with the consent of the clients, so too can the duty of confidentiality be managed with an appropriate ethical wall. Indeed, at least one court has explicitly considered – and rejected – Inphi's argument that the alleged conflict here cannot be waived because DLA Piper has "an ethical obligation to share all relevant information learned, regardless of the source or context, with [both of its clients]." (Mot. at 9.)

In the *Visa USA* case, the Court determined that the client had waived any prospective conflicts of interest by the Heller law firm. *Visa USA*, 241 F. Supp. 2d at 1110. Notwithstanding this, the client argued that because the Heller law firm had

previously obtained the client's confidential information, any joint representation would necessarily require the Heller law firm to breach its duty of confidentiality because the firm would be required to share confidential information from one client with the other. *Id.* at 1110. The Court disagreed, holding that the Heller law firm had created an appropriate and timely ethical wall to prevent a breach of the duty of confidentiality:

> Rather, Heller instituted the ethical wall to protect Heller's duty of confidentiality to its client First Data. First Data states that it has shared information concerning its finances and its general business plan to its patent lawyers, and argues that such information is presumed imputed to all Heller attorneys. Heller can rebut that presumption by "showing that effective screening procedures were implemented to prevent the passing of information between the tainted lawyer[s] and other members of the firm." Because First Data makes no showing in its papers beyond the presumption of shared confidentiality in support of its allegations, and because Heller has demonstrated that it immediately put an ethical wall in place as soon as Heller was retained as Visa's counsel in this action, there has been no breach of the duty of confidentiality here.

*Id.* at 1110 (citations omitted). Other decisions are in accord. *See In re County of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000) ("An ethical wall, when implemented in a timely and effective way, can rebut the presumption that a lawyer has contaminated the entire firm."); *City and County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 853 (2006) (reiterating that "California courts have upheld the ethical screening of that attorney within the government office to protect confidences the attorney obtained from the former client in a prior representation").

The undisputed facts establish that no Inphi confidences have been or will be divulged. (Forbes Decl. ¶¶ 15-18 & Exh. 7; Colker Decl. ¶¶ 14-15; Shepard Decl. ¶¶ 6-7; Cunningham Decl. ¶¶ 6-7.) Consistent with the Rules of Professional Conduct and the guidance of the California and Federal Courts alike, DLA Piper timely instituted an ethical wall that prevents the DLA Piper attorneys representing Netlist from accessing any Inphi confidential information. (Forbes Decl. ¶¶ 15-18.) Under the terms of that ethical wall, the DLA Piper attorneys representing Netlist "shall not

be allowed access to any Inphi files, whether physical or electronic." (Forbes Decl., Exh. 7.) Additionally, the DLA Piper attorneys representing Inphi "shall not disclose, in any manner, any information whatsoever regarding Inphi or its affairs" to the attorneys involved in the Patent Representation. (Forbes Decl., Exh. 7.) Finally, the recipients of the ethical wall are specifically reminded that DLA Piper's "firm policy prohibits breach of ethical walls, and violators are subject to disciplinary action up to and including termination." (Forbes Decl., Exh. 7.)

Inphi has proffered no evidence that this ethical wall has been breached, that there is a risk the ethical wall will be breached, or that any Inphi information relating to the Tax Representation will have any relevance to the Patent Representations. Indeed, the only evidence is to the contrary. (Forbes Decl. ¶¶ 15-18 & Exh. 7; Colker Decl. ¶¶ 14-15; Shepard Decl. ¶¶ 6-7; Cunningham Decl. ¶¶ 6-7.)

In short, where a law firm has erected an appropriate ethical wall to uphold its duty of confidentiality, it generally is permitted to simultaneously represent two clients that are adverse to each other if it has obtained written consent. As the following section demonstrates, such adverse representation is forbidden *only* where the two matters are substantially related. But that exception has no applicability here.

**2. The Tax Representation And The Patent Representation Are Not Substantially Related, And Inphi Has Not Met Its Burden Of Establishing Otherwise**

Even where a waiver has been obtained, where, unlike here, the representation of two clients are "substantially related," "courts will presume that confidences were disclosed during the former representation which may have value in the current relationship." *Truck Ins. Exchange v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1056 (1992). But Inphi's heavy reliance on *Truck Ins. Exchange* here is misplaced because Inphi has presented no evidence that DLA Piper's representation of Inphi in international tax matters bears any relationship – substantial or otherwise – to its representation of Netlist in this ongoing patent litigation.

Preliminarily, and importantly, *Inphi bears the burden* of proving the existence of a substantial relationship between two representations. *In re Charlisse*, 45 Cal. 4th 145, 166 n.11 (2008). Inphi may *not* rely on mere inferences, general assertions or vague and conclusory statements; it must instead present specific facts supported by admissible evidence establishing that a substantial relationship exists. *Faughn v. Perez*, 145 Cal. App. 4th 592, 596 (2006).

The substantial relationship test focuses "on the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases." *H.F. Ahmanson Co. v. Salomon Brothers Inc.*, 229 Cal. App. 3d 1445, 1455 (1991). Courts take a "pragmatic" approach to this inquiry. *Id.* "[E]ven where the two representations involve the same general subject, disqualification is not required if the *nature of the factual and legal questions posed are not similar*." *Santa Teresa v. City of San Jose*, 114 Cal. App. 4th 689, 711 (2003) (emphasis added). It is not sufficient if only "both representations share a common area of law." *Laker Airways v. Pan American World Airways*, 103 F.R.D. 22, 40 (D.D.C. 1984).

Here, Inphi's Motion and the accompanying declaration of John Edmunds fail to provide any "specific facts" to show that the two representations are substantially related. To the contrary, Mr. Edmunds describes DLA Piper's representation of Inphi as relating to "tax matters," (Edmunds Decl. ¶ 2), and DLA Piper's representation of Netlist as relating to a "patent infringement dispute." (Edmunds Decl. ¶ 6.) If there is an obvious relationship between those two representations, Inphi chose not to elucidate the Court or Netlist, and should not be permitted to do so for the first time in its Reply papers. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

And in any event, not only must there exist a substantial relationship between the two representations, but it must also appear that "confidential information material to the current dispute *normally would have been imparted to the attorney*." *Ahmanson*,

229 Cal. App. 3d at 1454 (emphasis added). Where, as here, the issues raised in the two matters are not sufficiently similar, there will be no presumption that the attorney in the course of one representation was likely to have obtained confidential information material to the other representation. *City and County of S.F.*, 38 Cal. App. 4th at 577; *Santa Teresa*, 114 Cal. App. 4th at 711 (emphasis added).

Here too, Mr. Edmunds's declaration falls far short of the requisite standard. He describes the information provided to Netlist in only vague terms such as "Inphi's confidential information and documents" and "confidential corporate information and documents." (Edmunds Decl. ¶¶ 3-4.) Mr. Edmunds does not allege – much less substantiate with admissible evidence – a claim that the information provided to DLA Piper in connection with the Tax Representation would be material to the Patent Representations. *See Elliott v. McFarland Unified School Dist.*, 165 Cal. App. 3d 562, 570 (1985) (rejecting conclusory statement that "I have confided, and members of my Board . . . have confided, in SLS and its attorneys information germane and vital to this [Elliot] lawsuit").

Because the Tax Representation and the Patent Representations are not substantially related, the core issue here is whether Inphi waived any alleged conflict arising out of DLA Piper's representation of Inphi and Netlist. *Id.* at 570 ("Absent such a 'substantial relationship' showing, courts have been reluctant to disqualify attorneys despite misgivings about the attorney's conduct.").

For this reason, the "hot potato" rule invoked by Inphi is irrelevant here. (Mot. at 10-11.) That rule dictates the "unavailability of withdrawal as a means of escaping application of the *per se disqualification rule* when a law firm creates the conflict." *Truck Ins. Exchange*, 6 Cal. App. 4th at 1059 (emphasis added). The circumstances here do not require per se disqualification; to the contrary, the Rules specifically provide that any potential conflict may be waived by Inphi and Netlist, which has occurred here. Accordingly, DLA Piper's position is that regardless of whether Inphi

is a former or current client, it has waived any alleged conflict arising out of DLA Piper's representation of Netlist.[2] That waiver is the dispositive fact here.

The next section explains that Inphi has in fact waived any alleged conflict, thereby requiring denial of its Motion.

**C. Inphi Provided Informed Written Consent Waiving Any Alleged Conflict Arising Out Of The Netlist Representation**

The parties do not dispute that the Engagement Letter "includes an advance waiver." (Mot. at 6.) Nor do they dispute the basic proposition that "[a]n advance waiver of potential future conflicts . . . is permitted under California law, even if the waiver does not specifically state the exact nature of the future conflict." *Visa USA*, 241 F. Supp. 2d at 1105 (citation omitted). Instead, the dispute here centers on whether the agreed-upon waiver provision encompasses a situation in which DLA Piper substitutes in (as contrasted with institutes) as counsel in an ongoing litigation. As discussed below, a plain reading of the waiver provision can lead only to the conclusion that the waiver does encompass the facts of this case, thereby making disqualification inappropriate.

**1. The Waiver Provision In The Engagement Letter Permits DLA Piper To Represent A Party Adverse To Inphi In An Ongoing Litigation**

The Engagement Letter contains a broad waiver provision, which encompasses a variety of potential conflict scenarios. Indeed, even Inphi concedes that "this waiver articulates a wide range of different types of representation." (Mot. at 7.) Notwithstanding these broad provisions, Inphi urges that DLA Piper's current

---

[2] Moreover, DLA Piper has not attempted to "fire" Inphi as a client in order to cement Inphi's status as a former client. As explained in the accompanying declaration of Brian Forbes, Inphi's unfounded accusations that 1) DLA Piper has breached its ethical obligations by undertaking to represent Netlist, and 2) DLA Piper will continue to breach the duty of confidentiality by ignoring the ethical wall and improperly sharing Inphi confidential information with Netlist, evidences a complete breakdown in trust and confidence between Inphi and DLA Piper, thus rendering further representation problematic. (Forbes Decl. ¶¶ 19-23.)

representation of Netlist goes beyond the bounds of the waiver because the "language is silent with respect to litigation." (Mot. at 7.) But this argument is incorrect for at least three reasons.

*First*, the Engagement Letter explicitly discloses that DLA Piper may represent other clients who are directly adverse to Inphi in scenarios that may be transactional or non-transactional in nature: "We may currently or in the future represent one or more other clients in *unrelated matters* ***or*** transactions in which your interests . . . are adverse to those other clients." (Forbes Decl., Exh 2 at 3 (emphasis added).) The juxtaposition of "transactions" and "matters" denotes that the waiver is not limited to conflicts of a transactional nature, and may include adversarial proceedings. In fact, the remainder of the waiver provision, which provides various examples of potential non-transactional conflicts, easily resolves any doubt as to the meaning of "unrelated matters." For example, the Engagement Letter discloses that such potential conflicts might arise in the context of "legislative or policy matters" as well as in the context of "administrative proceedings that may involve or affect Inphi or [its] affiliates." *Id.*

Having waived any conflict arising out of "administrative proceedings," Inphi can hardly claim surprise that it has waived certain conflicts arising out of a DLA Piper client being adverse to it in patent litigation. After all, companies often use administrative proceedings in the International Trade Commission ("ITC") to litigate claims of patent infringement. *See, e.g.*, David L. Schwartz, *Court Specialization: An Empirical Study of Claim Construction Comparing Patent Litigation Before Federal District Courts and the International Trade Commission*, 50 Wm. & Mary L. Rev. 1699, 1702 (2009)[3] ("Administrative law judges (ALJs) serve on the ITC as arbiters of cases that almost exclusively involve patent issues."); Robert W. Hahn and Hal J. Singer, *Assessing Bias in Patent Infringement Cases: A Review of International Trade*

---

[3] http://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1087&context=wmlr (Cunningham Decl., Exh. 7.)

*Commission Decisions*, 21 Harvard J. of L. & Tech. 457, 458 (2008)[4] ("The International Trade Commission ('ITC') — one of the two venues in which a firm can enforce its U.S. patent rights — awards patent holders nearly automatic injunctive relief if it finds infringement.").

*Second*, the waiver provision is not, as Inphi argues in its Motion, "silent with respect to litigation." (Mot. at 7.) Quite the contrary, the waiver provision is perfectly clear that while DLA Piper may assume the representation of another client in an *ongoing* litigation, it will not advise another client to "institute" or *commence* litigation against Inphi: "We do not view this advance waiver and consent regarding unrelated matters to permit us to *institute* litigation against Inphi nor to permit unauthorized disclosure or use of any of Inphi's confidential or privileged documents or information which Inphi has provided to us as Inphi's lawyers." (Forbes Decl., Exh. 2 at 3 (emphasis added).)

The plain meaning of the word "institute" – to both a layperson and to the legal practitioner – is beyond cavil; it connotes the act of initiating or starting something. The *Webster's New Universal Unabridged Dictionary* (Deluxe 2d ed. 1983) defines the word as follows: "1. to set up; establish; found; introduce. 2. to start; initiate; as, the city counsel *instituted* an investigation." The *Merriam Webster's Collegiate Dictionary* (11th ed. 2005) establishes a similar meaning: "2 a: to originate and get established." And in the context of the law and litigation, *Black's Law Dictionary* (9th ed. 2009) defines the term to mean, "To begin or start; commence." (Cunningham Decl., Exhs. 4 to 6.)

Even Inphi concedes that DLA Piper's reading of the express language is the correct one: "the express language precludes DLA Piper from instituting litigation adverse to Inphi." (Mot. at 8.) Undaunted, Inphi then urges the Court to divine the

---

[4] http://jolt.law.harvard.edu/articles/pdf/v21/21HarvJLTech457.pdf (Cunningham Decl., Exh. 8.)

parties' underlying "purpose," which apparently is directly contrary to the agreement's plain words. Hence, Inphi's Motion repeatedly makes reference not to the agreement itself, but to "the underlying purpose," the "very purpose of that [provision]," and "how Inphi understood the exclusion." (Mot. at 8.) In so doing, Inphi upends the very meaning of the provision and manages to express outrage that the provision might be construed to mean *exactly what it says*: "DLA Piper attempts to interpret the above exclusion language to allow representations adverse to Inphi in litigation in all cases except those in which DLA Piper 'institutes' the litigation." (Mot. at 8.)

Because there is no ambiguity in the provision itself, the Court need not – and may not – assume the role of an oracle. The important point is not "how Inphi understood the provision," or how Inphi wishes to re-write the provision today in order to gain a tactical advantage in this litigation. The important point is what the provision means on its face. *See Navarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir. 2008) ("If the contract language is clear, we give effect to its plain meaning.") (citation omitted).

And while not relevant to the appropriate legal analysis, it is noteworthy that DLA Piper – by restricting itself from instituting litigation against Inphi, but not from assuming ongoing litigation against Inphi – was doing more than just employing "clever language." (Mot. at 8.) By agreeing not to institute litigation against Inphi, DLA Piper precluded itself from advising a client to file a lawsuit that otherwise might never be filed. In some circumstances, this may effectively result in preventing litigation in the first instance. But where, as here, DLA Piper played no role in advising Netlist to institute the litigation or in instituting the litigation itself, Inphi must defend itself in litigation, *regardless* of whether Netlist is represented by the Pruetz Law Firm, by DLA Piper, or by some other firm. In other words, DLA Piper's refusal to represent Netlist now – on ethical or other grounds – would not affect whether the already-filed case proceeds.

*Third*, even if the Court were to find that the Engagement Letter is silent as to future litigation (which it is not), the disclosures in the Engagement Letter are

sufficient to effect a waiver of DLA Piper's current representation of Netlist. "An advance waiver of potential future conflicts . . . is permitted under California law, even if the waiver does not specifically state the exact nature of the future conflict." *Visa USA*, 241 F. Supp. 2d at 1105. Moreover, California Rule of Professional Conduct 3-310(C) clarifies that its "Disclosure" requirement simply involves "informing the client or former client of the *relevant circumstances* and of the *actual or reasonably foreseeable adverse consequences* to the client or former client." (emphasis added.)

Here, DLA Piper satisfied its disclosure obligations by providing numerous examples of ways in which future DLA Piper clients may be adverse to Inphi, including in administrative proceedings as well as the legislative context. Many, if not all, of these circumstances would effectively pit DLA Piper's future clients and Inphi in a zero-sum game, whereby one client's gain is another's loss.

Accordingly, DLA Piper adequately disclosed to Inphi that its future clients may take positions that are directly adverse to Inphi, and that those positions may be advanced to the detriment of Inphi. Thus, even if (as Inphi incorrectly asserts) the Engagement Letter does not explicitly discuss the possibility of litigation against Inphi, it nevertheless discloses the adverse consequences of such a potential litigation. Having had the benefit of such disclosure, Inphi nevertheless waived any future potential conflict. It should now be held to that waiver.

**2. The Tishman And Comerica Letters Do Not Undermine The Express Meaning Of The Engagement Letter**

Inphi contends that, despite the plain meaning of the Engagement Letter, the Court should ignore its plain meaning because "on two previous occasions, DLA Piper requested and obtained a specific waiver from Inphi to represent other clients adverse to Inphi, despite the existence of the advance waiver contained in the DLA Piper Engagement Letter." (Mot. at 3.)

This argument is based on an incorrect accounting of the facts. When Inphi approached DLA Piper to advise it regarding international taxation matters, DLA Piper

*already* had an ongoing attorney-client relationship with Comerica and Tishman. Thus, DLA Piper did not seek a waiver with respect to Comerica and Tishman after DLA Piper agreed to represent Inphi; instead, Inphi's agreement to waive the pre-existing conflicts with Tishman and Comerica was a *condition precedent* to DLA Piper's agreement to represent Inphi.

Before the Engagement Letter was signed, DLA Piper discussed that issue with Inphi and obtained an oral commitment from Inphi that it would provide a written waiver agreement. (Colker Decl. ¶¶ 5-6.) In an email to Inphi's Chief Financial Officer, John Edmunds, Mr. Colker explicitly confirmed that additional conflict letters relating to Comerica and Tishman would be forthcoming: "After we talked I learned that the bank and landlord conflict waiver letters will be in a separate letter which I should receive soon. However, we do have oral waivers so there should be no issue." (Colker Decl., Exh. 2.) Those letters were provided to Inphi shortly after DLA Piper sent the Engagement Letter, and Mr. Edmunds then signed those letters on behalf of Inphi. (Colker Decl., Exhs. 3-4.)

Because the Comerica and Tishman matters pre-dated the Inphi international tax consulting matter, DLA Piper's decision to provide explicit waivers with respect to Comerica and Tishman sheds no light on how DLA Piper subjectively interpreted the Engagement Letter's advance waiver provisions.

In any event, Inphi's argument is a *non sequitur*. Because the provisions of the Engagement Letter are unambiguous, DLA Piper's actions – both before and after execution of the Engagement Letter – are not relevant.

## IV. CONCLUSION

As part of the terms of its retention of DLA Piper, Inphi waived any future potential conflicts other than one that arises from DLA Piper *instituting* a lawsuit against Inphi. The terms of that waiver are both clear and enforceable. And it is undisputed that DLA Piper had no role in instituting either this litigation, or the Inphi

Litigation. For this and for the other reasons stated herein, Inphi's Motion should be denied in its entirety.

DATED: December 20, 2010

Kevin S. Rosen
GIBSON, DUNN & CRUTCHER LLP

By: /S/ ______________________________
Kevin S. Rosen

Attorneys for
DLA PIPER LLP (US)